UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ELIZABETH F. THIBODAUX                                CIVIL ACTION

VERSUS                                                NO. 11-165

MICHAEL J. ASTRUE, COMMISSIONER                       SECTION "J" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Elizabeth F. Thibodaux, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. §§ 405(g), 1381a. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

As ordered, Record Doc. Nos. 10, 15, plaintiff filed a timely Memorandum of Facts and Law. Record Doc. No. 18. Despite being ordered to file a reply memorandum, Record Doc. No. 15, defendant filed a Cross Motion for Summary Judgment, and filed it two days after the deadline, without seeking leave to do so. Record Doc. Nos. 21, 22. The court has nonetheless considered defendant's submission.

## I.  PROCEDURAL HISTORY

Thibodaux filed applications for disability insurance benefits ("DIB") and SSI on January 31, 2009, alleging disability since January 1, 2009, due to diabetes, bursitis, arthritis, slow learner, feet and kidney problems and neuropathy in both feet.  (Tr. 52, 97, 133, 137).  On February 9, 2009, the Commissioner denied plaintiff's application for DIB because she had not earned enough quarters of work credit to qualify.  Thibodaux acknowledged that the decision was accurate and did not seek any administrative review of it.  (Tr. 54, 58).  The decision regarding DIB is thus not before this court.

After her application for SSI was denied on April 2, 2009 (Tr. 62), Thibodaux requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 10, 2009.  (Tr. 21-51).  On February 26, 2010, the ALJ issued a decision denying plaintiff's application for SSI.  (Tr. 11-17).  After the Appeals Council denied review on December 23, 2010, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 1-3).

## II.  STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.    The ALJ erred in finding that plaintiff can return to "medium" and "light" past relevant work, when his decision finds her limited to sedentary work.

B.    The ALJ erred in finding that plaintiff's recent sitter job was "past relevant work."

C.    Because the ALJ's hypothetical to the vocational expert is obscured by inaudible sections, the vocational expert's responses are not substantial evidence.

D.    The ALJ lacked substantial evidence and failed to explain why he did not incorporate plaintiff's incontinence problems and other impairments in his assessment of her residual functional capacity.

E.    At the fifth step of the sequential evaluation, Thibodaux qualifies as disabled based on her restriction to sedentary work coupled with her illiteracy and her nonexertional limitations.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.    Thibodaux has not engaged in substantial gainful activity since the application date of January 31, 2009.

2.    She has severe impairments consisting of diabetes, hypertension and arthritis.  Her learning disability is non-severe.

3.    Plaintiff has the residual functional capacity to perform sedentary work as defined by 20 C.F.R. § 416.967(a), except that she can lift ten pounds frequently and 25 pounds occasionally; stand and/or walk two hours in an eight-hour work day; sit six hours in an eight-hour work day; activities of daily living including cooking, washing clothes, cleaning house with stops and starts, mopping the floors, making beds, watching television and occasional fishing; able to push, pull, reach, crouch, squat and stoop; and has normal hand and arm function, including gripping, pinching, grasping, handling and fingering.

4.    Although Thibodaux's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

5.      Based on the testimony of the vocational expert, Thibodaux is capable of performing her past relevant work as a sitter as she actually performed it because she described it as sedentary work.

6.      Based on her residual functional capacity to return to her past relevant work, plaintiff has not been under a disability since January 31, 2009, the date her application for SSI was filed.

(Tr. 13-17).

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393. This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209

F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2009).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920;

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[1]  The five-step

inquiry terminates if the Commissioner finds at any step that the claimant is or is not

disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If

she successfully carries this burden, the burden shifts to the Commissioner to show that

other substantial gainful employment is available in the national economy that the

claimant is capable of performing.  When the Commissioner shows that the claimant is

capable of engaging in alternative employment, the burden of proof shifts back to the

claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez, 64 F.3d at 174.

B.    Factual Background

Thibodaux testified that she was 49 years old on the hearing date, five feet one inch tall and weighed 142 pounds. She said she had lost more than 100 pounds since the previous year based on her doctor's advice to lose weight and maintain the weight loss. She stated that she lives with her husband in a trailer and that their only income is her husband's disability benefits of about $672 per month and food stamps of about $62 per month. (Tr. 24-26). She testified that they do not have medical insurance.

Plaintiff said she completed the tenth grade in high school, but did not go back to school because she could not read and it was too frustrating. She testified that she cannot read and that her daughter reads to her anything that she needs to have read to her. She said she cannot read a newspaper, can only write her name and does not write any grocery lists. (Tr. 26-27). She stated that she has a driver's license, which she obtained by taking an oral test, and that she had other people help her whenever she had to fill out a job application. She said that she is not good at making change and has never used a checking account. (Tr. 27-28).

Thibodaux testified that she last worked in January 2009 at a school for the handicapped, where she had to lift patients up from a wheelchair to change their diapers or for other tasks, and that she fed them. She stated that she only worked there for a few months and stopped because of tingling and numbness in her feet. Plaintiff said that, before that job, she worked as a sitter in patients' homes. She testified that she was able to fill out her paperwork by bringing with her another piece of paper to show her where she should put the words because she could not spell. (Tr. 28-29). She stated that she performed light housework for her patients and took them shopping in their own cars. She testified that she performed that job for four to six months and left to try to make more money because her hours were being cut.

Plaintiff said that, before the sitter job, she worked at Rouses Supermarket in the deli department initially, and then switched to working on the floor, where she retrieved grocery carts from outside, bagged groceries and cleaned the floors. She said that she needed assistance from "somebody to show me what stuff to put in the buffer and all." She testified that she asked to be moved out of the deli department because she could not read the menus and wanted a job that did not require reading. (Tr. 29-30).

Thibodaux said she worked at Rouses for a few months, but she really could not remember how long.[2] She recalled working as a cook at McDonald's, but only for a few days because she could not read the screen that showed the orders. She also worked for less than six months for the Sheriff's department in the jail as a supervisor cook over the trustees who did the cooking. She stated that she quit because she did not like being in the jail and because she had to make the menus, but could not read what she needed to obtain. (Tr. 30-31).

Plaintiff testified that, for the past year, her feet have tingled and hurt, which feels like standing in a bed of biting fire ants. She stated that her doctors told her this is caused by "nerve damage or dead in my feet." (Tr. 31-32). She said that her husband told her that her legs jump at night, but she has not noticed it. She testified that her pain does not happen every day, but occurs when she has been on her feet a lot during the day or when her legs have been "hanging" while sitting. She predicted that her feet would hurt that night after the hearing and she would have to elevate them for relief. (Tr. 32).

Thibodaux said she sits most of the time with her feet resting on a pillow on the coffee table, which keeps the pain under control, until she has to get up and run to the bathroom because of her kidneys. She stated that the pain affects her a lot when she is

_____

[2]According to her written Disability Report, Thibodaux worked as a cook's helper and deli worker at a grocery store/restaurant for three years. (Tr. 138).

walking. She said she recently took her daughter Christmas shopping in the evening until her legs felt weak and her feet hurt, and then she had to remain seated outside the stores and prop her feet up on the seat next to her. (Tr. 33-34). She testified that she bought and has been using a cane since February for balance when walking because her legs get weak and she does not trust them. She said that her physician, Dr. Reaves,[3] told her to use the cane if she felt that she needed it, but did not prescribe it.

Plaintiff stated that she went to the emergency room on April 24, 2009[4] because of problems with her kidneys. (Tr. 34). She said that she starts to urinate on herself if she coughs, sneezes or laughs. She testified that she has been on medication for this since she went to the emergency room, which stopped the problem, but the medicine no longer works and the urine is leaking again. She said she was scheduled to see her doctor the day after the hearing.

Thibodaux stated that she has to go to the bathroom every 15 to 20 minutes, but sometimes she does not make it to the bathroom on time, so she wets herself. She

---

[3]According to the medical records, Rachel Reaves is a Family Nurse Practitioner, not a medical doctor. (Tr. 173, 197, 200).

[4]There is no medical record of such a visit in the administrative transcript. However, a record from the Leonard J. Chabert Medical Center Urology Clinic on that date states that plaintiff was referred to the Clinic from the emergency room for symptoms of urinary incontinence. (Tr. 198).

testified that she has to change her clothes four to five times a day. She said she had "thought about" and was going to ask her doctor about wearing diapers. (Tr. 35).

Plaintiff testified that sometimes she feels lightheaded and almost falls when she stands up, unless her daughter or husband helps to steady her. She said her doctor put her on blood pressure medication when she reported this problem. She stated that her blood pressure is good when she checks it, but the doctor tells her it is still a little high. (Tr. 36).

Thibodaux said she gets her medication through a $4.00 plan at Wal-Mart, but sometimes she has difficulty getting it and has to borrow money from her mother-in-law to afford the medicine. She stated that she was on insulin for a while, but her doctor discontinued it because her blood sugar was either too high or too low. She still takes pills for diabetes and measures her blood sugar at home. (Tr. 37-38). She testified that her blood sugar used to run between 400 and 500, but now stays between 116 and 119 when she is on medication and she feels pretty good.

Plaintiff stated that her legs get weak and she has to sit down when she walks out of her trailer, down the steps and a few feet from the porch. She said she does not go up stairs without holding on to the railing and having someone beside or behind her. (Tr. 38-39). She testified that she can lift a 25-pound bag of sugar, but nothing heavier, and could not lift it more than once because her lower back and kidneys would hurt. She

stated that she can only stand for 10 to 15 minutes before she has to sit down because her legs get weak and she cannot feel her feet.  (Tr. 39).  She said that her lower back was hurting during the hearing and her legs were becoming completely numb.  She said she usually gets up and walks whenever she sits for a while, and she has good days and bad days with regard to being able to sit.

Thibodaux testified that she cleans the kitchen a little bit, but her daughter helps with the housework every day.  (Tr. 40).  She said she tries to do the sweeping, but it does not work.  She stated that she puts clothes in the washing machine and puts meals on to cook, but her husband or daughter then oversees the cooking.  She testified that, on a typical day, she tries to do something in the morning, like go out in the yard to do what she can, and then watches television with her feet elevated.  (Tr. 41-42).  She said she shops for groceries with her daughter for 30 to 40 minutes once a month.  For recreation, she said she goes outside, barbecues, visits friends and occasionally goes fishing, where she sits in a chair and props her feet up on a bucket.  She stated that she does not do anything else.  (Tr. 42-43).

Plaintiff stated that she made minimum wage when she was working as a sitter until January 2009 and that her take-home pay was a little less than $300 every two weeks.  She said she changed patients' diapers, helped them walk around and fed them, but did not prepare meals.  She testified that she was on her feet most of the time while

working that job. (Tr. 44-45). She stated that she was a supervisor when she worked for the Sheriff at the jail and she left because she did not like the job. She said that, when she worked in the deli at Rouses, her job included putting food out on the hot table, then she moved to retrieving carts from the parking lot, bagging groceries and cleaning floors. She said she worked at McDonald's, which the ALJ stated was in 2002. (Tr. 45-46). She testified that she left one job (the question was partially inaudible regarding which one) because of problems with her feet. (Tr. 46). When asked if she had to choose between sitting and standing, she said she could not do too much of either because of her feet and her kidneys. She could not remember the name of the medication she takes for her feet. (Tr. 46).

      C.    <u>Vocational Expert Testimony</u>

A vocational expert, Beth Drury, testified consistently with the <u>Dictionary of Occupational Titles</u> that plaintiff's past relevant jobs as a grocery bagger, which included shopping cart retrieval, and as a floor cleaner or waxer were both unskilled work at a medium exertional level. Drury stated that the job of cook's or kitchen helper in a deli is also unskilled, medium work. She testified that working as a sitter in a person's home is light and semi-skilled. (Tr. 46). Drury said that Thibodaux's work as a residential care aide and as a kitchen supervisor are both skilled, medium exertion jobs. However, Drury

stated that Thibodaux did not work at either of these jobs long enough to have acquired those skills. (Tr. 47-48).

The ALJ's hypothetical to the vocational expert was partially inaudible. As transcribed, the ALJ posited an

> individual who was 48 years old and on the last ones that were dated January 10th, 2009, [INAUDIBLE], you know, what [INAUDIBLE] would you describe [INAUDIBLE] as attention; some occasional [INAUDIBLE] and [INAUDIBLE]; can lift up to 20 pounds; standing and walking two out of eight and sitting six out of eight; activities of daily living would be cooking, washing the clothes, cleaning the house [INAUDIBLE]. [INAUDIBLE] include reaching [INAUDIBLE]; no [INAUDIBLE] to reach; no [INAUDIBLE]. [INAUDIBLE] work as described [INAUDIBLE].

(Tr. 49). Drury replied: "[B]ased on the past work, it would appear that she might be able to return to that sitter position. She can stand and walk, and I'm saying that based on her description that's provided, she was able to alternate her positions and based on her testimony . . . [n]ot as per the [Dictionary of Occupational Titles]." Drury testified that the same person could perform other sedentary jobs, such as ticket taker, assembler and packager, which are available in the state and national economies. Id.

Plaintiff's representative modified the hypothetical to include only occasional lifting; an ability to sit for six out of eight hours, but only with elevated feet resting on a pillow; accommodations so that Thibodaux could go to the bathroom as needed, possibly as often as three to four times per hour; and the need to walk with a cane. Drury

testified that these restrictions would eliminate the past relevant sitter job and all work. (Tr. 50).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 15-16).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ did not err in finding that plaintiff's recent sitter job was "past relevant work."

As required, the ALJ determined plaintiff's residual functional capacity at the fourth step of the sequential evaluation.  Giles v. Astrue, 433 F. App'x 241, 245 (5th Cir. 2011).  He found that Thibodaux has "the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a) except lift ten pounds frequently and twenty-five pounds occasionally; stand and/or walk for two hours in an eight hour workday; [and] sit for six hours in an eight-hour workday."  (Tr. 14) (emphasis added).  Step four of the sequential evaluation "directs a finding that the claimant is not disabled if the claimant's impairments do not 'prevent [the claimant] from doing past relevant

work.'"  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995) (quoting 20 C.F.R. §
404.1520(e) (1995)).

Past relevant work is defined as "work that you have done within the past 15 years,
that was substantial gainful activity, and that lasted long enough for you to learn to do
it."  20 C.F.R. § 416.960(b)(1) (emphasis added).  Based on her reported earnings of
$6,335.30 in 2008 and $4,023.64 in 2007 (Tr. 106, 115, 130), Thibodaux argues that the
amount earned from her sitter job or jobs was not significant enough for that job to
constitute "substantial gainful activity."  She contends that the job(s) should be
considered as repeated, unsuccessful work attempts, rather than "past relevant work."

Past relevant work must consist of "substantial gainful activity," which is further
defined as follows:

> (a)  Substantial work activity.  Substantial work activity is work activity
> that involves doing significant physical or mental activities.  Your work
> may be substantial even if it is done on a part-time basis or if you do less,
> get paid less, or have less responsibility than when you worked before.
> (b) Gainful work activity.  Gainful work activity is work activity that you
> do for pay or profit.  Work activity is gainful if it is the kind of work
> usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 416.972(a) (emphasis added); see also 20 C.F.R. § 404.1574(a)(1)
("Generally, if you worked for substantial earnings, we will find that you are able to do
substantial gainful activity.  However, the fact that your earnings were not substantial
will not necessarily show that you are not able to do substantial gainful activity."); Grant

v. Shalala, 33 F.3d 1379, 1994 WL 487172, at *4 (5th Cir. Aug. 15, 1994) (citing 20 C.F.R. § 404.1572(a)) (work may qualify as substantial gainful activity "even though it was only a part-time job"); compare 20 C.F.R. § 404.1574(a)(1) (emphasis added) ("We generally consider work that you are forced to stop or to reduce below the substantial gainful activity level after a short time because of your impairment to be an unsuccessful work attempt. Your earnings from an unsuccessful work attempt will not show that you are able to do substantial gainful activity.").

The ALJ's finding that Thibodaux performed substantial gainful activity (implicit in his finding that her job as a sitter was past relevant work) is supported by substantial evidence. First, plaintiff testified that she left her home sitter job, not because of her impairment, but to earn more money after her hours were cut. Thus, her home sitter job was not an unsuccessful work attempt.

Second, plaintiff testified that she performed the home sitter job for four to six months. Her earnings reported to the Commissioner were $6,335.30 in 2008 and $4,023.64 in 2007, for a total of $10,358.94. (Tr. 106, 115, 130). If she earned $10,358.94 in four months, she was earning the equivalent of approximately $2,600 per month. The same total amount earned over a six-month period constitutes about $1,725 per month. Either amount more than qualifies as gainful activity, even when compared to the average monthly amounts described in the legally non-binding Program Operations

Manual System of the Social Security Administration that plaintiff cites in her memorandum.  See Program Operations Manual System DI 10501.015:  Tables of SGA Earnings Guidelines and Effective Dates Based on Year of Work Activity, Social Security Online (Oct. 21, 2011), https://secure.ssa.gov/apps10/poms.nsf/lnx/0410501015 ("'Countable earnings' of employees indicate [substantial gainful activity] . . . if the amount averages more per month than" $940 in calendar year 2008 and $900 in calendar year 2007); see also Program Operations Manual System Home, Social Security Online (last visited Mar. 6, 2012), https://secure.ssa.gov/apps10/poms.nsf/Home?readform (The Program Operations Manual System "states only internal [Social Security Administration] guidance.  It is not intended to, does not, and may not be relied upon to create any rights enforceable at law by any party in a civil or criminal action."); Greenspan v. Shalala, 38 F.3d 232,239 (5th Cir. 1994) (citing Schweiker v. Hansen, 450 U.S. 785, 789-90 (1981)) (The Program Operations Manual System "is not binding law, because it is an unpublished policy statement."); accord Hickman v. Bowen, 803 F.2d 1377, 1380 n.6 (5th Cir. 1986); Marcello v. Bowen, 803 F.2d 851, 855 n.5 (5th Cir. 1986).

Third, in the Disability Report that she completed when she applied for benefits, Thibodaux stated that she had worked full-time, eight hours per day, five days per week, as a sitter for the handicapped from 2007 to 2008 at a pay rate of $7.00 per hour.  (Tr.

138). Her Disability Report thus reflects an income level of approximately $280 per week, $1120 per month or $14,000 per year, if she worked for a full year. Even if she only worked at the sitter job for a partial year, plaintiff's Disability Report, earnings record and testimony demonstrate that she performed substantial gainful activity because the job is the kind of work usually done for pay or profit and was actually performed for pay or profit. <u>Squires v. Soc. Sec. Admin.</u>, 441 F. App'x 659, 660 (11th Cir. 2011); <u>Strahan v. Chater</u>, 66 F.3d 323, 1995 WL 534913, at *1-2 (5th Cir. Aug. 16, 1995). Because her sitter job was substantial gainful activity, it is also past relevant work.

2. The ALJ's decision does not limit plaintiff to sedentary work and he did not err by finding that she could return to her past relevant work as a sitter.

Thibodaux argues that the ALJ erred by finding that she could perform her past relevant work as a sitter, which the vocational expert testified was either medium or light work, because the ALJ's residual functional capacity assessment limited her to sedentary work. This argument misinterprets both the ALJ's findings regarding her residual functional capacity and the vocational expert's testimony.

"Sedentary work," as defined by the Commissioner's regulations and the case law, involves lifting <u>no more than ten pounds at any time</u>; occasionally lifting or carrying articles like docket files, ledgers and small tools; sitting for about six hours out of an eight-hour work day; and occasionally walking or standing for no more than about two

hours in an eight-hour day.  20 C.F.R. §§ 404.1567(a), 416.967(a); <u>Holifield v. Astrue</u>, 402 F. App'x 24, 24 n.1 (5th Cir. 2010) (citing <u>Ripley v. Chater</u>, 67 F.3d 552, 557 n.25 (5th Cir. 1995)); <u>Johnson v. Astrue</u>, 291 F. App'x 548, 551 (5th Cir. 2008) (citing SSR 83-10, 1983 WL 31251 (1983)).

> "Light work," which is the next most strenuous category,
>
> involves <u>lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds</u>.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b) (emphasis added).

The ALJ found that plaintiff has the residual functional capacity to perform sedentary work, including the ability to stand and/or walk for two hours and sit for six hours in an eight-hour work day, "except [that she can] lift 10 pounds frequently and 25 pounds occasionally."  (Tr. 14).  Thus, he determined that Thibodaux actually can lift <u>more</u> than the definition of sedentary work would allow.  Instead of stating that plaintiff can perform sedentary work, with the exception that she can lift <u>more</u> than required, the ALJ could have made the identical findings by stating that plaintiff has the residual

functional capacity to perform <u>less than</u> the full range of light work, because she can meet the lifting requirements of light work, but can only stand and/or walk for two hours. The regulations and the case law recognize that a claimant's residual functional capacity can fall between the full ranges of work. 20 C.F.R. § 200.00(d); <u>Trimiar v. Sullivan</u>, 966 F.2d 1326, 1333 (10th Cir. 1992) (citing <u>Campbell v. Bowen</u>, 822 F.2d 1518, 1523 n.2 (10th Cir. 1987)).

Based on that residual functional capacity and the vocational expert's testimony, the ALJ found that Thibodaux is capable of performing her past relevant work as a sitter <u>as she actually performed it</u>–<u>not</u> as defined by the <u>Dictionary of Occupational Titles</u>–because she described it as sedentary work. (Tr. 17). This finding is supported by substantial evidence.

Although Drury testified that the <u>Dictionary of Occupational Titles</u> classifies the job of sitter as light work, she testified that "based on the past work, it would appear that [plaintiff] might be able to return to that sitter position. She can stand and walk, and I'm saying that based on her description that's provided, she was able to alternate her positions and based on her testimony . . . <u>[n]ot as per the [Dictionary of Occupational Titles]</u>." (Tr. 49) (emphasis added). Past relevant work can be performed "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).

Therefore, the ALJ did not err by relying on the vocational expert's testimony that plaintiff can perform her past relevant work as a sitter, as she described and performed it. Ward v. Barnhart, 192 F. App'x 305, 309 (5th Cir. 2006); Cooper v. Barnhart, 55 F. App'x 716, 2002 WL 31933144, at *1 (5th Cir. 2002); Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990).

> 3. The vocational expert's testimony was transcribed and is substantial evidence upon which the ALJ could rely.

Thibodaux argues that the parties and the court cannot determine what hypothetical question the ALJ asked the vocational expert because the transcript of the ALJ's question was "broken up by 13 inaudible gaps." Record Doc. No. 18 at p. 10. Plaintiff contends that Drury's responsive testimony is therefore not substantial evidence.

According to the transcript, the ALJ posed a hypothetical of an

individual who was 48 years old and on the last ones that were dated January 10th, 2009, [INAUDIBLE], you know, what [INAUDIBLE] would you describe [INAUDIBLE] as attention; some occasional [INAUDIBLE] and [INAUDIBLE]; can lift up to 20 pounds; standing and walking two out of eight and sitting six out of eight; activities of daily living would be cooking, washing the clothes, cleaning the house [INAUDIBLE]. [INAUDIBLE] include reaching [INAUDIBLE]; no [INAUDIBLE] to reach; no [INAUDIBLE]. [INAUDIBLE] work as described [INAUDIBLE].

(Tr. 49).

Drury replied: "[B]ased on the past work, it would appear that she might be able to return to that sitter position. She can stand and walk, and I'm saying that based on her description that's provided, she was able to alternate her positions and based on her testimony . . . [n]ot as per the [Dictionary of Occupational Titles]." Drury testified that the same hypothetical person could perform other sedentary jobs, such as ticket taker, assembler and packager, which are available in the state and national economies. Id.

"Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected." Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007) (quotation and citations omitted). Thibodaux has not shown that any of her substantial rights were affected by the imperfections in the transcript.

Although there are gaps in the transcript of the ALJ's single, one-paragraph hypothetical question, Drury's responses are transcribed fully. This fact distinguishes the two cases cited by plaintiff, which were remanded for further proceedings because the vocational expert's testimony was inaudible. See Russell v. Sullivan, 914 F.2d 1492, 1990 WL 136648, at *1 (4th Cir. 1990) ("two crucial responses of the vocational expert were inaudible to the court reporter"); Reese v. Astrue, No. 6:07cv0022, 2008 WL 4144435, at *6 (W.D. Va. Sept. 5, 2008) (The ALJ asked "a series of hypothetical questions" to the vocational expert regarding plaintiff's three past jobs. "In all, over just these three key pages of the record, there are 28 portions of the testimony which were

deemed by the transcriber to be '[INAUDIBLE].' The answer to one complete hypothetical question is missing as being inaudible.").

In the instant case, the ALJ found in his written opinion that Thibodaux has the residual functional capacity to perform sedentary work as defined by 20 C.F.R. § 416.967(a), except that she can lift ten pounds frequently and 25 pounds occasionally; stand and/or walk two hours in an eight-hour work day; sit six hours in an eight-hour work day; activities of daily living including cooking, washing clothes, cleaning house with stops and starts, mopping the floors, making beds, watching television and occasional fishing; able to push, pull, reach, crouch, squat and stoop; and has normal hand and arm function, including gripping, pinching, grasping, handling and fingering. The printed transcript of his hypothetical question to Drury contains sufficient information to indicate that the question matched the residual functional capacity stated in his written opinion.

The ALJ then held that

[t]he vocational expert testified that a person of the claimant's age, education and work profile with the above residual functional capacity could perform the claimant's past job of sitter as she described it. . . . I have given substantial weight to the vocational testimony . . . . In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as it was actually performed inasmuch as she reported that her work as a sitter was sedentary work.

(Tr. 17) (emphasis added). The ALJ accurately described Drury's testimony. His finding that plaintiff could perform her past relevant work as a sitter as actually performed is consistent with that testimony. Drury's testimony is substantial evidence upon which the ALJ was entitled to rely. Villalpando v. Astrue, 320 F. App'x 208, 211 (5th Cir. 2009); Weary v. Astrue, 288 F. App'x 961, 967 (5th Cir. 2008); Leggett, 67 F.3d at 565; Vaughan v. Shalala, 58 F.3d 129, 132 (5th Cir. 1995); Villa, 895 F.2d at 1022; Social Security Ruling 00-4P, 2000 WL 1898704 (Dec. 4, 2000).

Accordingly, this assignment of error lacks merit.

4.      The ALJ did not err by failing to explain why he did not incorporate plaintiff's incontinence problems and other impairments in her residual functional capacity.

Thibodaux argues that the ALJ's determination of her residual functional capacity failed to take into account her incontinence, her need to use a cane to ambulate and her need to elevate her feet to relieve pain. When her representative added these limitations to his hypothetical question to the vocational expert, Drury testified that plaintiff would be unable to perform any jobs. The ALJ found that Thibodaux's incontinence was "under treatment" and that her allegations of disabling pain and other symptoms were not credible to the extent alleged. She contends that her alleged limitations are supported by her testimony and by a nerve conduction study on July 1, 2009, which confirmed that she has lower extremity motor-sensory axonal peripheral neuropathy. (Tr. 200).

The ALJ posed a hypothetical to Drury that accounted for plaintiff's age, education, work experience and physical limitations, which the ALJ found to be credible. The vocational expert testified that such a claimant could perform Thibodaux's past relevant work as a sitter, as she had actually performed it, and other sedentary work, such as a ticket taker, assembler or packager.

Plaintiff was represented at the hearing, and her representative also questioned Drury. An ALJ's hypothetical question is defective and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994); accord Vaught v. Astrue, 271 F. App'x 452, 456 (5th Cir. 2008); Boyd v. Apfel, 239 F.3d 698, 706-07 (5th Cir. 2001).

In this case, plaintiff's representative questioned Drury and asked her about the work-related effects of plaintiff's alleged abilities to perform only occasional lifting; to sit for six out of eight hours, but only with elevated feet resting on a pillow; with accommodations so that she could go to the bathroom as needed, possibly as often as three to four times per hour; and the need to walk with a cane. Drury testified that these

restrictions would eliminate all work. However, the ALJ found that the record did not support such requirements. The record substantially supports his findings. Therefore, the ALJ was not required to include such limitations in his hypothetical. Carey v. Apfel, 230 F.3d 131, 143 (5th Cir. 2000).

Regarding her incontinence, Thibodaux was diagnosed with polyuria[5] by her treating family nurse practitioner, Rachel Reaves, at Leonard J. Chabert Medical Center on February 3 and June 18, 2009. (Tr. 171, 195). At a consultative examination by Aubrey Carhill, M.D., on March 14, 2009, Thibodaux reported an unspecified kidney problem, but denied any urinary frequency. (Tr. 176). Dr. Carhill did not report or diagnose incontinence. (Tr. 178).

Plaintiff was seen in the Chabert Urology Clinic on April 24, 2009 for symptoms of urinary incontinence. The urologist diagnosed mixed urinary incontinence, a

---

[5]Polyuria is "urine output of [more than] 3 [liters]/day . . . ." The most common cause of polyuria is uncontrolled diabetes mellitus. Seyed-Ali Sadjadi, M.D., Polyuria, The Merck Manual (Sept. 2009), http://www.merckmanuals.com/professional/genitourinary_disorders/symptoms_of_genitourinary_disorders/polyuria.html?qt=polyuria&alt=sh.

combination of urge and stress incontinence,[6] and prescribed Ditropan.[7]  Thibodaux

testified that she had been on this medication since she went to the emergency room on

April 24, 2009, and that the medicine had stopped the problem for some time, but it no

longer worked.

Thibodaux was scheduled to return to the Urology Clinic on October 23, 2009 (Tr.

198-99) and to the Internal Medicine/Family Practice Clinic on October 20, 2009.  (Tr.

197).  Other than an electromyelogram/nerve conduction study to evaluate the tingling

and pain in her feet on July 1 (Tr. 200) and an eye examination on July 16, 2009 (Tr.

194), there are no medical records of any additional medical treatment through the date

of the ALJ's opinion.

Although plaintiff testified that she had a doctor's appointment scheduled for the

day after the hearing, no medical records document any treatment _after_ the ALJ's

opinion.   While her case was pending before the Appeals Council, Thibodaux's

representative submitted an undated letter from a "Dr. T. Johnson" at Chabert Medical

---

[6]"Urge incontinence is uncontrolled urine leakage (of moderate to large volume) that occurs immediately after an urgent, irrepressible need to void. . . .  Stress incontinence is urine leakage due to abrupt increases in intra-abdominal pressure (eg [sic], with coughing, sneezing, laughing, bending, or lifting)."  Paul D. Lui, MD, Urinary Incontinence, The Merck Manual (Mar. 2008), http://www.merckmanuals.com/professional/genitourinary_disorders/voiding_disorders/urinary_inco ntinence.html#v1051515.

[7]Ditropan (generic name:  oxybutynin) "is used to treat symptoms of overactive bladder, including frequent urination, urgency (increased need to urinate), and urge incontinence (inability to control urination)."  PDRhealth (PDR Network, LLC 2011), http://www.pdrhealth.com/drugs/ditropan.

Center, which the representative had received on May 21, 2010. (Tr. 168). Dr. Johnson stated that plaintiff was being treated for diabetes and hypertension and had neuropathy, but did not mention that she had any problems with incontinence. (Tr. 169). His letter is not supported by any additional treatment records.

Thibodaux testified that she needs a cane to ambulate, but admitted that no doctor had prescribed the cane. No medical records indicate that she needs to use a cane or to elevate her feet constantly. Dr. Carhill noted that she did <u>not</u> use an assistive device and that she could walk heel-to-toe and tandem, had normal range of motion and reflexes in all joints, and was able to crouch, squat and stoop. Regarding her complaints of neuropathy, he noted that all of her extremities were cool to the touch and that she had decreased sensation to light touch in her big toes bilaterally and diminished pedal pulses in her feet. Her neurological signs were otherwise intact. (Tr. 177-78). He noted that plaintiff reported arthritis in her knees that "comes and goes," but the condition had never been formally evaluated, she took no medication for it and it "does not appear to contribute to significant pain/mobility limitations for her." (Tr. 175, 178). Dr. Carhill concluded that plaintiff "may benefit from being placed on medication specifically to address her peripheral neuropathy but at this point it does not appear to affect her overall functional status outside of her neuropathic pain." (Tr. 178).

A claimant's lack of need for medication or failure to seek treatment is a relevant factor to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Anthony v. Sullivan, 954 F.2d 289,  295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).  The medical records in this case do not support plaintiff's allegations of uncontrollable incontinence or severe problems in ambulating that would render her incapable of performing her past relevant work.

This assignment of error lacks merit.

> 5. Even if the ALJ had reached the fifth step of the sequential evaluation, Thibodaux does not qualify as disabled based on her alleged restriction to sedentary work, illiteracy and nonexertional limitations.

Thibodaux's claimed illiteracy is irrelevant to the ALJ's finding at step four that she could return to her past relevant work, which ended the sequential evaluation.  She argues nonetheless that she should have been found disabled at step five based on her limitation to sedentary work, her age of 49, her illiteracy and her nonexertional impairment of incontinence.  Rule 201.17 of the Medical-Vocational Guidelines directs a finding of disability at the fifth step for a younger individual age 45 to 49, who is

limited to sedentary work, is illiterate and has either unskilled or no previous work experience. As explained in the preceding sections of this report and recommendation, the ALJ's findings that Thibodaux has the residual functional capacity to perform <u>more</u> than sedentary work and that her incontinence does not severely limit her residual functional capacity are supported by substantial evidence.

Even if the ALJ had found at step four that she cannot return to any past relevant work and had proceeded to step five, her residual functional capacity to perform more than sedentary work alone would preclude application of Rule 201.17 of the Medical-Vocational Guidelines. In addition, the record does not substantially support her alleged illiteracy, which also precludes use of Rule 201.17.

"Illiteracy means the inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 416.964(b)(1).

Thibodaux testified that she cannot read or write. However, she completed at least the tenth, and possibly the eleventh, grade without attending special education classes. (Tr. 26, 141-42, 175, 176). She therefore completed more than the requirements for a marginal education and actually has a limited education, which are the next two defined levels <u>above</u> illiterate in the Commissioner's regulations. <u>See</u> 20 C.F.R. § 416.964(b)(2) ("formal schooling at a 6th grade level or less is a marginal education"); <u>id.</u> §

416.964(b)(3) ("a 7th grade through the 11th grade level of formal education is a limited education").  She told Dr. Carhill that she had never lost a job because of her limited education and/or being a slow learner who is "unable to read quickly or process information."  (Tr. 175).  Plaintiff has failed to establish that she is illiterate.[8]

## CONCLUSION

The ALJ did not err in finding that plaintiff's recent sitter job was "past relevant work" or that she can return to her past relevant work as a sitter as she performed it.  The vocational expert's testimony was clearly transcribed and is substantial evidence upon which the ALJ could rely.  The ALJ's determination of Thibodaux's residual functional capacity was supported by substantial evidence.  The ALJ did not need to proceed to the fifth step of the sequential evaluation, but even if he had, Thibodaux failed to establish either that she was restricted to sedentary work or that she is illiterate, thus precluding application of Rule 201.17 of the Medical-Vocational Guidelines.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

---

[8]Based on Thibodaux's oral representation on the record in open court at the call docket hearing conducted on July 13, 2011, Record Doc. No. 12, that she could not read or write sufficiently to respond pro se to the court's briefing order in this case, I delayed the briefing schedule until a lawyer from Southeast Louisiana Legal Services could confer with plaintiff and determine if that office would enroll to represent and assist her with the required briefing.  Record Doc. Nos. 11-17.  My order was made for those limited purposes and was not a finding of fact as to plaintiff's literacy level.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[9]

New Orleans, Louisiana, this _____8th_____ day of March, 2012.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[9]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.